*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* NEILL, Minors.

UNPUBLISHED
July 21, 2022

No. 359219
St. Joseph Circuit Court
Family Division
LC No. 2017-000020-NA

Before: SAWYER, P.J., and LETICA and PATEL, JJ.

PER CURIAM.

Respondent-mother (respondent) appeals as of right the trial court's order terminating her parental rights to her minor children, JN, CN, KN, and MN.[1] We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Respondent had an extensive history with Children's Protective Services (CPS) and prior removals. In 2017, the children were removed because of physical abuse by the father against respondent. Specifically, the father broke into respondent's apartment and assaulted her when she was pregnant with KN. Respondent obtained a personal protection order (PPO) against the father, but nonetheless married him in June 2018. The children were returned but removed again in 2019, for improper supervision and domestic violence. In the petition, it was asserted that a minor child was found running near a busy highway. In April 2020, the children were returned.

In December 2020, the Department of Health and Human Services (DHHS) filed a petition seeking an order removing minor children JN, CN, and KN from respondent's care. This petition alleged that KN was in his car seat when the father and respondent both pulled KN in different

---

[1] The biological father of JN and CN was contacted but did not participate in the proceedings. His parental rights were terminated, and he has not appealed. The husband of respondent-mother is the biological father to KN and MN, and his parental rights were terminated to his children. He filed a claim of appeal in Docket No. 359220. Respondent-father was the stepfather to JN and CN, and the only father figure they had known. For ease of reference, respondent-father will be referred to as father in this appeal.

-1-

directions while arguing with each other. The father also purportedly struck respondent in the face. The petition alleged that a similar struggle over KN occurred a couple weeks earlier. The petition described the history of domestic violence between the father and respondent, which included several interactions with law enforcement in 2020, as well as the children's prior removals. More troubling, the petition also noted that CN recently sustained a fractured skull and injuries to his shoulder and pelvis. At the time of the petition, a medical determination of the cause or source of the injuries had not been received. Although the father consistently attributed CN's injuries to a fall out of a bunk bed, respondent gave inconsistent accounts, including whether she was even present at the time of the injury.[2] Following a preliminary hearing in December 2020, all three children were removed from respondent's care. After respondent gave birth to her fourth child in January 2021,[3] the petition was amended to include this child, MN, who was removed and placed in the same foster care home as KN.[4]

Respondent was permitted to participate in supervised visitation with the children. However, after the children suffered severe adverse health or behavioral consequences from the visits, the trial court granted a formal motion to suspend them.[5] Although the goal for respondent was reunification, DHHS amended the petition to seek termination of respondent's parental rights.

CPS caseworker Derek Heath testified regarding his investigation of CN's injury. Respondent told Heath that while she and the father were on the main floor of their home cleaning up after dinner, CN fell from a bunk bed in an upstairs bedroom. Heath later learned that respondent told emergency medical personnel that she was not at home when the injury occurred, that the father had called her and told her what happened, and that she had just arrived back at the house when the emergency medical personnel arrived. Yet, at the hospital, respondent told hospital employees that she was at home when the injury occurred.

---

[2] An amended petition included further allegations of incidents in which the father physically abused CN. The amended petition also alleged that in April 2021, the father had contact with respondent, in violation of a court order. According to the amended petition, respondent was aware of the father's history of violence and failed to protect the children from continued contact with him. The petition also alleged that respondent discouraged the children from honestly reporting the father's behavior to authorities.

[3] This child, MN, was the second biological child that the father shared with respondent.

[4] Initially, the guardian ad litem and respondent's advocate expressed reservations regarding the need to remove the children from respondent's care. Respondent's advocate had worked in the home with the couple and only witnessed arguing between the couple, not domestic violence. However, after additional information of threats and CN's injuries were disclosed, the guardian ad litem supported the removal, and the advocate modified her position if domestic violence allegations were deemed to be true.

[5] JN licked his lips to the point where he caused injury, CN suffered from digestive issues, and KN suffered from behavioral issues in proximity to the parenting time visits.

In his testimony, Dr. James Henry, the director and cofounder of the Children's Trauma Assessment Center at Western Michigan University, opined that respondent's parental rights should be terminated to all four children. Dr. Henry testified that JN had seen the father abuse respondent and JN's siblings many times. JN did not understand why respondent would allow the father to return home after he was arrested and jailed. Dr. Henry determined that respondent was not able to demonstrate that she could provide the necessary care, supervision, and support for the children, and that respondent denied that the father was causing any harm. Dr. Henry concluded that respondent's priority was to protect herself and the father, not her children's well-being. Dr. Henry noted respondent's failure to protect the children and failure to provide the children with physical and psychological safety.

Dr. Henry also opined that CN's injuries were caused by the father. Specifically, the minor children revealed that the father threw CN against a wall, causing a skull fracture. CN also reported that the father had physically harmed respondent, but respondent denied this. Dr. Henry again noted a failure by respondent to protect CN that resulted in a serious physical injury, as well as serious psychological injury because of the trauma and fear CN experienced from the father.[6]

Dr. Henry concluded that KN experienced the same violence and fear in the home that JN and CN experienced, but KN was unable to communicate those experiences because of his age. Again, Dr. Henry opined that respondent had failed to protect KN.

Dr. Henry also believed respondent's treatment of JN, CN, and KN was indicative of how respondent would likely treat MN. Dr. Henry testified that respondent had a historical pattern of denying the harm perpetrated by the father. Dr. Henry believed that putting MN in respondent's care would put MN at risk of harm in light of respondent's demonstrated failure to protect the children.

Dr. Henry found that respondent was still in the "pre-contemplation stage of change," which meant that respondent did not believe that she had done anything wrong and that there had been no harm perpetrated toward herself or the children. In light of his research, Dr. Henry opined that it could take 18 to 24 months before any significant change would occur. Dr. Henry testified that this was not a reasonable time considering the age of the children. Given respondent's long-standing pattern of abuse, it was unlikely that respondent would make any significant changes. Dr. Henry advised the trial court that he believed very strongly that there was a reasonable likelihood that the children would be harmed if they were returned to respondent's care.

---

[6] Reports prepared by the trauma assessment center indicated that the children initially abided by respondent's wishes that they not disclose or discuss the abuse that they witnessed and experienced. The children would not discuss their home life and indicated that respondent would not like it if they discussed the abuse. Eventually, CN disclosed that his injuries were caused when the father threw him and he landed on respondent's foot stool. CN also indicated that he liked living in foster care because he did not see people beat up. Another child expressed that he would like to become a police officer one day and arrest the father. The record evidence indicated that JN had witnessed at least 10 acts of domestic violence, and the police had contacts with the couple on 40 occasions.

Additionally, a caseworker also recommended termination in light of the children's exposure to abuse by seeing the father repeatedly harm respondent since 2016. This worker opined that respondent continued to have contact with the father within the six weeks prior to the dispositional hearing requesting termination of parental rights in light of complaints made to the police.

Respondent's therapist concluded that respondent had made progress in the therapy sessions but it was insufficient to allow the children to return to respondent's care. The therapist opined that termination of respondent's parental rights would be appropriate because there was emotional damage suffered by the children, respondent was not prepared to meet the children's emotional needs, and there was a reasonable likelihood based on respondent's conduct and capacity that the children would be harmed if returned to respondent's care.

A YWCA victim advocate facilitated a domestic assault support group in which respondent participated. In her opinion, respondent made progress, cared for the children, and wanted what was best for them.

Respondent testified that she grew up in households where abuse was prevalent and normalized. Now, she realized that the abuse committed by the father was wrong. Respondent testified that she was unaware of the father's abuse of the children, and she learned that the father hurt them during a parenting time visit. At the time of the dispositional hearing, MN and KN were in preadoptive placements, but JN and CN were not. Respondent testified that she earned $21 an hour and had the financial ability to care for the children.

With regard to CN's injury, respondent testified that she remembered making dinner for the children, but did not remember anything until CN was sitting in the living room downstairs vomiting blood. Respondent could not recall where she was when the injury occurred. Respondent believed that the injury occurred in the upstairs bedroom because of the blood there. According to respondent, three weeks after the injury, JN said that CN got hurt when he was "playing Spiderman" and jumped off the bed. Respondent attributed her memory issues to the coping skill of disassociating, which was developed during her childhood as a result of abuse and trauma that she suffered. She further explained that, at the time of CN's injuries, she had entered a phase of her pregnancy where she was experiencing physical difficulties.

The trial court found that petitioner proved by clear and convincing evidence that termination was appropriate under MCL 712A.19b(3)(g) and MCL 712A.19b(3)(j). It emphasized the testimony that respondent had not progressed far enough to meet the needs of the children and that it would be emotionally harmful to return the children to respondent at that point. The trial court noted the expert testimony that, at best, it would take at least 18 to 24 months before respondent made any significant changes. The trial court also credited the testimony of the experts and caseworkers who believed that respondent's parental rights should be terminated. The trial court found that CN's injury was caused by the father and respondent failed to protect the children. The trial court appreciated that respondent engaged in various services to make progress toward reunification. Nonetheless, it concluded that respondent had failed the children when she allowed the father to return to the family home.

The trial court also found that it was in the children's best interests that respondent's parental rights be terminated. The trial court found that respondent had a "dysregulated" bond with the children. The trial court concluded that, given the ages of the children and the testimony that it could take at least 18 to 24 months before respondent made any significant changes, respondent could not provide the needed stability and permanency to the children. The trial court, therefore, ordered that respondent's parental rights to all four children be terminated.

## II. STATUTORY GROUNDS FOR TERMINATION

Respondent first alleges that the trial court erred when it found by clear and convincing evidence that there were statutory grounds for termination of respondent's parental rights. We disagree.

To terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination expressed in MCL 712A.19b(3) has been established. *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020) (citation omitted). A challenge to the trial court's finding that a statutory ground for termination was established is reviewed for clear error. *Id*. A finding is clearly erroneous when there is some evidence to support it, but a review of the entire record leaves the reviewing court with the definite and firm conviction that the trial court made a mistake. *Id*. Only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds. *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). Regard is given to the trial court's special opportunity to determine the credibility of the witnesses who appeared before it. *Id*. at 33. We conclude that there was clear and convincing evidence to support MCL 712A.19b(3)(g), and the trial court did not clearly err in its determination. *In re Mota*, 334 Mich App at 320.

The statutory ground for termination of MCL 712A.19b relied on by the trial court provides:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

The trial court found that respondent had a job that paid her $21 an hour, and she had the financial ability to care for the children. However, the trial court determined that respondent had "totally failed" to provide proper care and custody for any of the four children. Indeed, the couple engaged in acts of domestic violence in front of the children. Although the children were returned to the couple in early 2020, by December 2020, there was a report to CPS of continued abuse. Specifically, the couple essentially engaged in a "tug of war" of KN that was witnessed by two other individuals. During the course of the struggle, it was alleged that the father struck the respondent in the face. Weeks earlier, CN suffered a skull fracture, and he later revealed that his

injury was caused by the father. The trial court identified the trauma the children had endured as "trauma directed at them by physical abuse and other forms of abuse by their father, and what they've observed as abuse to [respondent]." Because the past behavior had been "abysmal," the trial court found that there was no reasonable expectation that respondent would be able to provide proper care and custody to any of the children within a reasonable time considering the children's ages.

On appeal, respondent submits that the trial court did not give proper weight to the bond that respondent had with the children. The strength of respondent's bond with the children is not relevant to the determination that termination was warranted under MCL 712A.19b(3)(g). Moreover, the caseworkers and experts questioned the bond between respondent and the children. There was testimony that respondent had difficulty balancing four children during the parenting time visits. Furthermore, when a visit ended, the children proceeded to leave, and respondent had to request a goodbye from them. Additionally, the parenting time visits were suspended after it was determined that the visits were detrimental to the children. Because respondent denied the extent and nature of the abuse, the children felt betrayed by her. They began to experience negative physical and behavioral effects both before and after the visits. Thus, the trial court's weight to the bond between respondent and the children was supported by the record evidence.

Respondent also contends that the trial court erred by not giving sufficient weight to the progress that she made. At the dispositional hearing, there was some evidence that respondent made progress since the petition was filed. Yet, it was further evident that respondent progressed from a complete denial of the domestic violence to minimizing the degree and nature of the abuse. It was also well established that she had not progressed to the point the children could be safely returned to her. The testimony presented at trial suggested that it could take years before respondent could be reunified with the children. Therefore, the trial court did not clearly err in its consideration of the progress respondent had made and its finding that termination was warranted under MCL 712A.19b(3)(g). The evidence supported the trial court's finding that respondent failed to provide proper care or custody to the children and that, given the ages of the children, there was no reasonable expectation that respondent would be able to provide such care within a reasonable time.

Respondent submits that the order terminating her parental rights should be reversed because she filed for divorce from the father and obtained a PPO against him. Although these actions reflect that respondent made progress, they did not demonstrate that she would be capable of providing proper care to the children. Although a formal divorce action and a PPO were signs of improvement, respondent had the father arrested for domestic violence, but allowed him to return to the family home after his release. Further, a caseworker reported that respondent married the father despite the existence of a PPO.[7] In finding that statutory grounds for termination existed, the trial court noted that respondent had the potential to engage in a different abusive relationship because she had not sufficiently addressed the past domestic violence. Reversal premised on respondent's minimal action is unwarranted.

---

[7] Although respondent indicated that she married the father for insurance reasons, the caseworker discounted that rationale.

-6-

The trial court did not clearly err when it determined that termination of respondent's parental rights was warranted under MCL 712A.19b(3)(g). Multiple witnesses testified that respondent was not able to provide proper care for the children at that time and that it could be years before respondent had progressed to that point. On the basis of the evidence presented at trial, the trial court did not clearly err when it found that there was no reasonable expectation that respondent would be able to provide proper care and custody within a reasonable time considering the children's ages.[8]

### III. BEST INTERESTS OF THE CHILDREN

Lastly, respondent contends that the trial court erred when it found by a preponderance of the evidence that it was in the best interests of the children to terminate respondent's parental rights. We disagree.

Once a statutory ground for termination has been established, the trial court must conclude that termination of parental rights is in the child's best interests before it can terminate parental rights. MCL 712A.19b(5); *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). A trial court's decision regarding a child's best interests is also reviewed for clear error. *In re Laster*, 303 Mich App 485, 496; 845 NW2d 540 (2013). When making the best-interests determination, the trial court may consider the entire record. *In re Pederson*, 331 Mich App 445, 476; 951 NW2d 704 (2020).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). A child's placement with relatives is also a factor to consider and generally weighs against termination. *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015).

The trial court did not clearly err in concluding that termination of respondent's parental rights was in the children's best interests. The trial court found that the older children had a "dysregulated" bond with respondent. For JN specifically, the trial court determined that this child

---

[8] In light of our conclusion that MCL 712A.19b(3)(g) was satisfied, we need not address the trial court's finding that MCL 712A.19b(3)(j) was also met. However, we agree with the trial court that the evidence also fulfilled this statutory subsection. Respondent had stopped denying that the domestic violence occurred, but she continued to minimize the abuse and its impact on the children. Because respondent had not addressed the underlying circumstances that brought her into inappropriate relationships, the trial court noted that respondent had the potential to be involved in other domestic violence partnerships.

tried to protect respondent against domestic violence. The trial court also found that, because of her young age, MN did not have a bond with respondent. Additionally, the trial court concluded that, given the young ages of the children, they all needed stability, permanency, safety, and security, which respondent could not provide. The trial court determined that, at the earliest, it would be 18 to 24 months before respondent was able to provide the children with the necessary stability, permanency, safety, and security. But, this was an unacceptable amount of time for the children to wait. The trial court also referred to the opinions of respondent's therapist, Dr. Henry, and the guardian ad litem, who all believed that respondent's parental rights should be terminated.

On appeal, respondent contends that the trial court failed to give proper weight to the bond she had with the children, and it was unfair criticism to minimize the bond by citing to the management of all four children during parenting time visits. However, respondent's position ignores the evidence that the children felt betrayed by respondent for failing to acknowledge the domestic abuse as well as the physical and emotional abuse that they suffered as a result of the toxic relationship between respondent and the father. Furthermore, the visits were suspended because of the severe physical and emotional impact on the children.

Respondent also alleges that the trial court erred by finding that it was in the children's best interests to terminate respondent's parental rights instead of providing respondent "a bit of additional time" to work toward reunification. Respondent does not specifically identify how much more time she would need to be prepared to provide proper care for the children. Dr. Henry testified that it would likely take 18 to 24 months for significant changes in respondent to begin. In Dr. Henry's opinion, that was not a reasonable time considering the children's ages. There was testimony that respondent had made some progress. However, the family first came to the attention of CPS in 2017 when the children were removed. The children were removed again in 2019 and 2020. The trial court's finding that the children's need for permanency, stability, and safety required termination of respondent's parental rights is well supported by the record, and that finding was not clearly erroneous. Respondent has not established that the trial court clearly erred when it determined that termination of her parental rights for all four children was in their best interests.

Affirmed.

/s/ David H. Sawyer
/s/ Anica Letica
/s/ Sima G. Patel